UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JENNIFER S. BARD | : | Case No.: 1:17-cv-266 |
| University of Cincinnati College of Law | | |
| 2600 Clifton Avenue | : | |
| Cincinnati, OH 45220 | | |
| | : | Judge _____ |
| Plaintiff, | : | |
| | : | |
| vs. | : | **COMPLAINT WITH JURY** |
| | : | **DEMAND ENDORSED HEREON** |
| UNIVERSITY OF CINCINNATI | | |
| 2600 Clifton Avenue | : | |
| Cincinnati, OH 45220 | | |
| | : | |
| PETER F. LANDGREN | | |
| 2600 Clifton Avenue | : | |
| Cincinnati, OH 45220 | | |
| | : | |
| Defendants. | : | |

Now comes plaintiff, Jennifer S. Bard, by and through counsel, and for her

Complaint against defendants, University of Cincinnati and Peter F. Landgren, states as

follows:

**PARTIES AND CLAIMS**

1. Since July 1, 2015, Jennifer S. Bard (hereinafter "Bard" or "Dean Bard"), has

   been the Dean of the University of Cincinnati College of Law, a tenured full

   professor in the College of Law holding the Nippert Chair and a tenured full

   professor in the College of Medicine. Dean Bard has been on involuntary

   Administrative Leave from her deanship since March 22, 2017.

2. The University of Cincinnati (hereinafter "UC"), is a State institution of higher education. The College of Law is a constituent college of UC.

3. Peter F. Landgren (hereinafter "Landgren" or "Interim Provost"), is the Interim Provost of UC. As the Interim Provost, Landgren is a final policy-maker on matters of academic governance and discipline. He is sued in his individual and official capacities. At all times relevant hereto, Landgren acted under color of law in denying Dean Bard Due Process of Law and in retaliating against her for exercising her First Amendment right to speak on matters of public concern.

4. Dean Bard brings this action under the First and Fourteenth Amendments to the Unites States Constitution, pursuant to 42 U.S.C. §1983, and pursuant to Ohio law for breach of contract.

5. Dean Bard seeks relief in the form of an injunction against UC and Landgren ordering her reinstatement as Dean and further ordering Landgren and UC to remove Dean Bard from Administrative Leave and a Declaratory Judgment that Dean Bard has engaged in no misconduct or other activity that justified her placement on Administrative Leave.

6. Dean Bard further seeks money damages against Landgren for violation of her First and Fourteenth Amendment rights, and money damages against UC for breach of contract.

## JURISDICTION

7. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, 1334 and 1367. Federal jurisdiction is appropriate because Dean Bard seeks to secure protections under, and to redress deprivations of, rights conferred by the First and Fourteenth Amendments to the Constitution of the United States.

## VENUE

8. Venue in this Court is proper because the actions out of which these claims arose occurred within the Southern District of Ohio.

## BACKGROUND

9. Bard was appointed Dean of the College of Law of the University of Cincinnati ("College of Law" or "College") on July 1, 2015.   Prior to that appointment she had a successful legal career in government, private practice and academia. She was the College of Law's first female dean in its then 184-year history.

10. Dean Bard was hired by former UC President Santa Ono and former Sr. Vice President for Academic Affairs and Provost Beverly Davenport.

11. Pursuant to her Offer Letter Dean Bard was hired for a five (5) year employment term expiring on June 30, 2020 at an annual salary of $300,000.  She was charged with the specific obligation to reduce the College's deficit and increase its enrollment.

12. In her first year, she successfully accomplished critical required objectives and metrics.  These accomplishments and challenges were recognized by Provost Davenport and Dean Bard was awarded a $15,000 bonus for her achievements.

3

13. Shortly thereafter Provost Davenport was elevated to Interim President of UC. Peter Landgren, (at that time the Dean of the College Conservatory of Music) was appointed as Interim Provost.  Bard began to report to Landgren.

14. In Bard's efforts to address the severe deficit facing the College, she reviewed various expense and budget issues. She found instances of gross mismanagement of public funds.  Accordingly, she began to tighten financial controls.

15. She also began to consider other issues at the College.  She discovered that the admissions office was using outdated and ineffective methods of recruiting candidates, evaluating files, and awarding scholarships.  She retained a nationally known admissions officer as a consultant and began hiring staff who could bring contemporary best practices to the admissions process.

16.  She considered other cost saving options.   For example, one option that had been suggested by Provost Davenport and which Bard agreed to investigate, was a plan to reduce the cost of an independently operating law library by consolidating administration of the College of Law Library with the overall UC Library system.

17. These changes were wholly necessary and the practices were approved by Provost Davenport.  Not surprisingly, these changes rankled a number of faculty who were reaping the financial and other benefits from a law school that was operating in deficit.  Some faculty grew unhappy about Bard reining in uncontrolled expenses.

18. Under the strong leadership of Provost Davenport these faculty members did not resist these changes.  However, when Provost Davenport left the Provost position and, only months later, announced she would be leaving UC for a Chancellor position elsewhere, a significant leadership vacuum emerged.  With no President and only an Interim Provost, those faculty members who felt financially threatened, seized on the opportunity to manipulate the situation for their own benefit.

### A GROUP OF FACULTY THREATEN A NO CONFIDENCE VOTE

19. In late November 2016, Dean Bard gave a presentation to the faculty which demonstrated the severe fiscal constraints facing the College.  Among the issues she discussed was that the College was using operating funds, while in deficit, to make up what were supposed to be fully endowed salary supplements for faculty members holding "endowed professorships."

20. Certain faculty members, particularly those with endowed chairs, responded with outrage to the presentation.  They concluded and assumed that there would be cost-cutting measures enacted that might include a reduction in the annual salary supplement for these professors.

21. Shortly after the presentation about the College's finances, a small group of faculty members, substantially comprised of the professors who faced a possible reduction in their salary supplement, met with the Interim Provost.

22. Following that meeting, the Interim Provost met with Dean Bard on December 6, 2016.  He informed her that a group of faculty were unhappy and had threatened

5

they would go to the press with a vote of "No Confidence" if she did not resign by December 14, 2016.

23. The concerns of the faculty reflected ordinary tensions between faculty and the Administration.  Some of the concerns were entirely self-serving, and many were based on inaccurate information and fears about anticipated conduct.

24. The Interim Provost assured Dean Bard that none of the allegations was sufficient to justify removal for cause.  Nonetheless, he requested that she resign.

25. Dean Bard refused to resign.  She wanted to address the concerns of the faculty and, with the assistance of a mediator, open up communication on the issues that the faculty had raised.

26. The Interim Provost agreed to this plan.  In late December, just prior to the holiday break, the parties agreed to a "6 Month Plan to Share Perspectives and to Restore Mutual Trust and Respect" ("the 6 Month Plan" or "Plan"). The Plan is attached as Exhibit 1.  The 6 Month Plan included three core principles: Coaching, Mediated Communication and Periodic Evaluation and Objective Metrics.

27. Dean Bard reached out to the faculty and advised them of the plan to move forward and work with the guidance of a neutral third-party.

## POST- HOLIDAY BREAK EVENTS AND THE INTERIM PROVOST'S INTERFERENCE WITH THE PLAN

28. In early January 2017, Dean Bard contacted an organizational development company called Breakthrough Collaboration ("the Company").  Dean Bard

selected the organization because it had experience with mediating with law school faculties.

29. She conveyed the information to the Interim Provost but he delayed in contacting the Company.

30. In late January, the Faculty began to inquire about the status of the Plan. Given the Interim Provost's delay, Dean Bard responded that she was working with the Provost's Office and would provide information as soon as she had specifics.

31. On or about January 23, 2017, Breakthrough Collaboration presented a proposal for moving forward. The proposal consisted or two phases: Phase 1 was the organizational assessment phase and Phase 2 was the mediation and intervention phase.

32. On or about January 24, 2017 the Interim Provost prepared a statement for the faculty advising that he was in the process of engaging a mediator with the goal to bring open, honest, direct and safe communication between the faculty and staff of the College of Law and Dean Bard. That statement to the faculty was consistent with Bard's understanding that mediated communication would be at the heart of the implementation of the Plan.

33. As later events revealed, the Interim Provost's statement was false. Further, it was designed to establish expectations on the part of the faculty that the Interim Provost did not intend to honor.

34. Indeed, just a few days later, the Interim Provost entered into an agreement with the Company but agreed only to Phase I of the proposal – namely the 360 Evaluation. Despite the express obligations under the 6 Month Plan, the Interim

7

Provost refused to commit to Phase 2 – the mediated communication. In short, he agreed to that part of the proposal that would gather information about the faculty and staff's concerns about Dean Bard but would not commit to mediation to resolve the issues that would inevitably emerge from the survey.

35. Dean Bard began to grow concerned that the Interim Provost was not acting in good faith. She became wary that he was using the 6 Month Plan, not to improve communication, but to force her resignation as some Faculty demanded.

36. In addition, she had specific and legitimate concerns about the design of the survey itself. Those concerns became even more magnified by the fact that the Interim Provost would not commit to the mediation phase.

37. She expressed these concerns to Breakthrough Collaboration as well as to the Interim Provost in a series of email exchanges. When these efforts did not produce a mutually acceptable survey, she requested that the Company representative come to Cincinnati and have a face-to-face meeting with her and Interim Provost. She also continued to press for mediated communication in the first instance, as called for by the Plan and as promised to the faculty by the Interim Provost.

38. By this time, however, the Interim Provost dropped any pretense of holding up his end of the 6 Month Plan to resolve the communications issues between Dean Bard and certain members of the faculty. He demonstrated that he was not interested in working cooperatively and he fully shut down communication on the subject. In an email communication to Dean Bard on February 27, 2017, he

8

ordered that "We will be moving forward with an anonymous survey of College of Law faculty and staff."

39. In that same email, he prohibited her from making any further changes to the Survey without his approval.

40. Despite the Interim Provost's fiat, which was contrary to the 6 Month Plan, Dean Bard continued to try to explain the reasons that she did not believe that proceeding with the 360 Evaluation was a productive method to accomplish the goals as set forth in the 6 Month Plan.

41. Dean Bard grew increasingly alarmed that the faculty, who had now been promised mediated communication and were expecting such, would not receive what had been promised. She sent a lengthy email to the faculty on March 15, 2017, a copy of which is attached as Exhibit 2. In that email she conveyed, among many issues, that the Interim Provost would not agree to move forward with the agreed upon plan to start the mediation.

43. On March 20, 2017, Dean Bard wrote to the Interim Provost to express her deep concerns. That email ended as follows: "No outside observer could fail to notice that I am the first woman dean of the law school, and am being treated very differently than any previous dean of the law school, at UC. . . ."

## THE EVENTS LEADING TO DEAN BARD BEING PLACED
## ON ADMINISTRATIVE LEAVE

44. On March 19, 2017, the Cincinnati Business Courier ("CBC") published an article entitled *"University of Cincinnati law dean under fire from faculty."* The article was written based on materials CBC had acquired through an open records request.

9

45. That same day, in response to the CBC article, which was based on partial information, Dean Bard provided CBC with additional information about the underlying tensions at UC.  The material she sent included her March 15 email to the Faculty.

46. On March 21, 2017, CBC published an article entitled *"UC law dean responds to calls for her ouster."*  The article revealed that the calls for Dean Bard's ouster resulted from faculty resistance to her steps to tackle the College's deficit.

47. The very next day, in response to Dean Bard publicly airing these issues, the Interim Provost placed her on Administrative Leave effective immediately.

48. In the meeting placing her on Administrative Leave, the Interim Provost stated that the reason he was placing her on leave was because he believed she had lost the trust of the faculty.  He claimed the Dean had lost their trust because she had failed to follow through on her promise to bring in a mediator.  This was of course, utterly self –serving, as it was the Interim Provost who refused to bring in a mediator and insisted exclusively on a 360 survey instead.

49. There was no basis in fact or law for placing Dean Bard on Administrative Leave.

50. Placing Dean Bard on Administrative Leave violated UC's Policies regarding Administrative Leave attached hereto as Exhibit 3.  Pursuant to UC's policies, there are only two types of Administrative Leave.  One is Non-Investigatory Administrative Leave which is a voluntary leave requested by the employee. Dean Bard did not request this leave.

51. The other is Investigatory Administrative Leave appropriate only when "an allegation of misconduct is made against an employee which, in the opinion of the appropriate Human Resources Department representative, requires that the employee be removed from the worksite in order to maintain the health, safety or welfare of that employee or others while the allegations against the employee are investigated."

52. Dean Bard did nothing that would warrant Administrative Leave. There was no allegation of misconduct made against her whatsoever, much less an allegation that would require removal to maintain the health, safety or welfare of an employee.

53. For the three months between the faculty threat of "No Confidence" and the date Dean Bard was placed on Administrative Leave, she continued to carry out all her duties and to represent the College to students, faculty, alumni and donors. This alone is sufficient to demonstrate that no claim of misconduct motivated the Interim Provost's action.

54. Moreover, the Defendants fully admitted there was no basis for placing her on Administrative Leave. Indeed, at a meeting the Interim Provost had with faculty on March 24, 2016, the Interim Provost confirmed that Bard had done "nothing 'illegal,'" there were no "ethical or moral issues," no "financial" issues" and there was no new allegation or "smoking gun" that caused him to place her on Administrative Leave.

55. In the formal letter placing her on leave, the Interim Provost wrote that "I have evaluated your progress under the plan for improvement that we developed and

finalized in December 2016" and "determined that the plan for improvement is not working."

56. The 6 Month Plan was plainly not a performance improvement plan. The phrase "performance improvement plan" had never once been used in the dozens of communications between the parties. Rather, the 6 month Plan was a contract to restore trust with which the Interim Provost interfered and frustrated.

57. The letter further stated that "while on leave you should not perform any work on behalf of or act as an agent of the University of Cincinnati. Between now and 28 April 2017 it is expected that you will devote your full energy to developing a transition plan."

58. The Interim Provost wrote to the College of Law Community stating falsely that "this decision is precipitated by a thorough evaluative process that involved in large part the College of Law community. I will work with the dean to develop a thoughtful transition plan in an expeditious timeframe." Based on the facts, there had been no "thorough evaluative process." Moreover, UC was obligated to work for a period of 6 months under the contract and the Interim Provost had no right to take any action until at least the conclusion of the 6 month period.

59. The Interim Provost has failed to work with Dean Bard to "develop a thoughtful transition plan in an expeditious timeframe." Since he placed her on Administrative Leave he has not communicated with her at all.

60. The Interim Provost's decision to place Bard on Administrative Leave was made in retaliation for Dean Bard providing information to the press concerning the

financial difficulties facing the College of Law and the response of a small group of faculty.

61. The Interim Provost's decision to place Bard on Administrative Leave was made in retaliation for her statement questioning whether the manner in which she was being treated by UC was discriminatory based on her gender.

62. Bard, through her counsel, has made repeated requests to UC to rescind the Administrative Leave, and take such other actions which will clear Bard's name of the implication of misconduct that surrounds Administrative Leave. All such requests have been ignored or rebuffed.

63. Bard has suffered enormous reputational and employment damages as a result of having been improperly placed on Administrative Leave. She will continue to suffer these damages until she is removed from Administrative Leave and there is a declaration that Administrative Leave was improper.

64. Bard has suffered economic and reputational damages by having lost access to the Nippert Chair and all the financial benefits associated with it. The Nippert Professor of Law position provided her with financial resources to carry out research-related functions and presentations at legal conferences which are central to her work and to her reputation in the academic community.

## COUNT I – Denial of Due Process

65. Dean Bard possesses a 14th Amendment property interest in her positions as Dean and tenured Professor, and in the reputational interests which are integral components of those positions. As such, these interests may not be impaired by Defendants without Due Process of Law.

13

66. Landgren's placement of Dean Bard on Administrative Leave without notice or an opportunity to be heard significantly impaired these interests and violated her right to Due Process of Law under the 14th Amendment. The impairment of her rights is ongoing, and her damages will continue to multiply if the Defendants are not enjoined from continuing their unconstitutional conduct.

## COUNT II - Denial of Due Process

67. Dean Bard possesses a 14th Amendment liberty interest in her positions as Dean and tenured Professor, and in the employment and reputational interests which are integral components of these positions. As such, these interests may not be impaired by Defendants without Due Process of Law.

68. Landgren's Placement of Dean Bard on Administrative Leave without notice or an opportunity to be heard significantly impaired these interests and violated her right to Due Process of Law under the 14th Amendment. The impairment of her rights is ongoing, and her damages will continue to multiply if the Defendants are not enjoined from continuing their unconstitutional conduct.

## COUNT III - First Amendment Retaliation

69. Dean Bard possesses a First Amendment right to speak on matters of public concern without being subject to retaliation by the Defendants. When she provided information to the Cincinnati Business Courier in response to an article regarding the claims made against her by some faculty members, the matters at issue were clearly of public concern.

70. Landgren's placement of Dean Bard on Administrative Leave immediately following her comments to the Cincinnati Business Courier was impermissibly motivated by Dean Bard's exercise of her right to speak on these matters of public concern, and abridged Dean Bard's First Amendment rights. The impairment of her rights is ongoing and her damages will continue to multiply if the Defendants are not enjoined from continuing their unconstitutional conduct.

## COUNT IV – DECLARATORY JUDGMENT

71. Dean Bard cannot obtain complete relief from the stigma of her unfounded and unconstitutional placement on Administrative Leave, the consequent harm to her reputation, and the financial losses without a judgment of the Court declaring that such leave is unlawful and in violation of her rights under the 14th Amendment, and is therefore entitled to a such a judgement so that she is made whole insofar as possible.

## COUNT V – Breach of Contract

72. Dean Bard and UC entered into a contract of employment effective on or about July 1, 2015. The contract provides that Dean Bard will be employed as the Dean of the University of Cincinnati College of Law for a five year term.

73. Dean Bard performed her duties under the contract.

74. On March 22, 2017, UC breached Dean Bard's employment contract by summarily, and without notice, relieving her of all duties as Dean, and directing her to cease performing any work on behalf of UC or as an agent of UC.

75. UC has provided no cause or excuse for its breach of the contract with Dean Bard.

15

76. Dean Bard has suffered damages as a result of such breach.

### COUNT VI – Breach of Contract

77. In order to address concerns of the faculty, Bard and UC entered into an agreement known as the "6 Month Plan to Share Perspectives and to Restore Mutual Trust and Respect" on January 6, 2017.

78. Under the terms of this agreement, the parties were to devote six months to engaging in defined activities to address the concerns of the law school community.

79. Dean Bard performed her duties under the contract.

80. UC failed to perform its obligations under this agreement, and ultimately breached it entirely by placing Dean Bard on Administrative Leave on March 22, 2017.

81. Dean Bard has suffered damages as a result of such breach.

WHEREFORE, Dean Bard demands the following relief:

1. Injunctive relief against UC and Landgren ordering her reinstatement as Dean, reinstatement to the Nippert Chair and further ordering Landgren and UC to state publicly that Dean Bard has engaged in no misconduct or other activity justifying her placement on Administrative Leave;

2. Compensatory and punitive damages against Landgren for violation of her First and Fourteenth Amendment rights;

3. A Declaratory Judgment that Defendants had no lawful or factual basis for placing Dean Bard on Administrative Leave, and that Dean Bard engaged in no misconduct or other activity justifying her placement on Administrative Leave.

4. Money damages against UC for breach of contract;

5. Attorney fees and costs;

6. Trial by Jury and

7. All other relief which the Court deems appropriate and proper.

Respectfully submitted,

/s/ R. Gary Winters
R. Gary Winters  (0018680)
McCaslin, Imbus & McCaslin
632 Vine Street, Suite 900 Cincinnati,
OH   45202
Phone:  513-421-4646
Fax:  513-421-7929
e-mail:  rgwinters@mimlaw.com *Trial Attorney for Plaintiff*

OF COUNSEL:      Marjorie E. Berman
Krantz & Berman LLP
747 Third Avenue, 32nd Floor
New York, New York 10017
212-661-0009
MBerman@krantzberman.com

## JURY DEMAND

Plaintiff demands a trial by jury on all issues contained herein.

/s/ R. Gary Winters
R. Gary Winters  (0018680)
Trial Attorney for Plaintiff

17